**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

MICHEAL (SUSIE) HOFFMAN,                )
MARGARETT ROUMAIN,                     )
GREGORY FRANK, VICTOR                  )
YUSTMAN, VICTORIA FELLOWS,             )
MARIA DEGLAUVE, RON OZAKI,             )
BERNHARD J. ORNELLAS, ERNEST           )
HEWSON, DONNA LOUCKS,                  )
ROXANN MERLINI, JO GAWLER,             )
and ROBERT KEARNEY,                    )
                                       )
      Plaintiffs,                       )     No. 21-cv-06395
                                       )
      v.                                )     Judge John J. Tharp, Jr.
                                       )
UNITED AIRLINES, INC., UNITED          )
AIRLINES 36-MONTH                      )
SUPPLEMENTAL BENEFIT PLAN,             )
UNITED AIRLINES VOLUNTARY              )
SEPARATION PROGRAM 2 (VSP2),           )
UNITED AIRLINES FRONTLINE              )
VOLUNTARY SEPARATION LEAVE             )
(VSL) PROGRAM, UNITED                  )
AIRLINES CONSOLIDATED                  )
WELFARE BENEFIT PLAN, and              )
UNITED AIRLINES RETIREE                )
MEDICAL PROGRAM,                       )
                                       )
      Defendants.                       )
                                       )

**MEMORANDUM OPINION AND ORDER**

      This action arises from a dispute over a policy announced by United Airlines, Inc., in 2017,

which promised all then-current employees that if any "early out" program was offered within

three years of their retirement, they would be eligible for the financial benefits of that program.

The plaintiffs bring this action on behalf of themselves and a putative class of similarly situated

former employees of United, alleging that United reneged on that promise and denied them the

monetary benefits of two early retirement programs offered within three years after they retired.

They seek the payment of benefits as well as injunctive and equitable relief under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* In the alternative, they claim entitlement to relief under a state law theory of breach of contract. The defendants have moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. For the reasons set forth in this opinion, that motion is granted.

## **BACKGROUND**

The following facts are drawn largely from the plaintiffs' Second Amended Complaint. In assessing motions brought under Rule 12(b)(6), the Court accepts as true all of the complaint's well-pleaded facts and draws all reasonable inferences therefrom in the plaintiffs' favor. *See Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 334 (7th Cir. 2012). The Court also takes notice of the various plan and policy documents attached to the defendants' motion to dismiss, which are "referred to in the [plaintiffs'] complaint and are central to [their] claim." *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1248 (7th Cir. 1994).

**The 2017 Policy**

By way of background, United has, at various times, offered certain employees "early out" programs, which incentivize long-term employees to voluntarily separate from the company earlier than they otherwise would have in exchange for additional compensation and/or benefits. Second Amended Complaint (hereinafter, "SAC") ¶ 32, ECF No. 54. These programs are typically offered during times of financial distress, in order to reduce the company's overhead. *Id*.

In August 2017, the CEO of United, Oscar Munoz, sent an announcement to all United employees stating: "[A] frequent question that arises from our colleagues is: When can we expect to have another early out opportunity so that we can plan for retirement?" *Id*. ¶ 35. Munoz explained that many employees were hesitant to retire when they wanted to for fear that an "early out" program may be offered in the near future and that they may miss out on the benefits of that

program because they had already left the company. *Id.* ¶ 36. In order to allay that fear, Munoz said, beginning on August 17, 2017, if United offered an early out program within 36 months after an employee's retirement, that employee would be "eligible for the financial benefits of the program even after retiring." *Id.* ¶ 37. The written version of the policy (the "2017 Policy") stated:

> In the event that the Company offers an Early Out program after August 17, 2017, any employee who has retired in good standing within the previous 36 months of the closing date of the Early Out election window, meets all applicable Early Out Plan eligibility requirements and conditions as of their retirement date and, whose last work assignment immediately prior to retirement was from the workgroup offering the Early Out, will be eligible to participate in the Early Out and receive all monetary benefits being offered. . . . This policy would not affect retiree benefits or retiree travel and does not apply to any employee who retired under a previous Early Out Program. The Company reserves the right to modify or terminate this policy at any time and for any reason.

Ex. A to Lounsbury Decl. in Support of Mot. to Dismiss (hereinafter, "Lounsbury Decl.") 2, ECF No. 59-1. A set of "Frequently Asked Questions," issued in conjunction with the 2017 Policy, clarified that "[t]he company will provide any corresponding monetary amount that the retiree would have been eligible for under the designated eligibility criteria for the early out plan being offered" and that "[y]ou will be eligible to receive the financial benefits of any early out program which applies to the last workgroup you worked in immediately prior to retirement." Ex. B to Lounsbury Decl. 2, ECF No. 59-2.

**Voluntary Separation Program 2 ("VSP2")**

In the summer of 2020, United introduced the Voluntary Separation Program 2 ("VSP2"), which offered various types of severance benefits to employees of specified age and years of service, across the entire company, who retired under the program. SAC ¶¶ 45-46, 52. There were two "options" available under VSP2. *Id.* ¶ 47. Under one of those options, employees would be provided with a three-month "leave" period during which they would receive 25% of their pay and enhanced medical benefits. *Id.* The FAQs that accompanied VSP2 stated that the program was not

3

an early out program, and therefore not covered by the 2017 Policy—that is, anyone who retired within 36 months prior to the offering of VSP2 was not eligible for its benefits. *Id*. ¶¶ 49-50. The FAQs stated: "This program is not an early out, which is a financial incentive program. This program provides partially paid leave or medical, retirement benefit[s] and pass travel enhancements. These types of benefits are excluded from the 2017 policy." Ex. I to Lounsbury Decl. 10, ECF No. 59-9. United told employees that VSP2 would be "the richest voluntary package we foresee being able to offer." SAC ¶ 55. It also threatened that employees who did not take VSP2 could be furloughed. *Id*. ¶ 54.

### Sunsetting of 2017 Policy

In October 2020, United announced that it would be sunsetting the 2017 Policy as of January 1, 2021. Ex. C to Lounsbury Decl. 2, ECF No. 59-3. The FAQs issued with that announcement stated that the 2017 Policy had been put in place because "[a]t that point, we were confident that, barring a completely catastrophic situation (one like COVID-19, which we never would have predicted), we would not have a need to offer an early out." *Id*. at 4. However,

> our situation now is completely different than it was in 2017. . . . [W]e have found ourselves needing to encourage employees to take separation or retirement opportunities, so the August 2017 early out policy no longer makes sense. Changing this policy does not signal that we are planning to offer an early out program in early 2021. At this time, we do not have any plans to offer an early out.

*Id.*. The FAQs also included the question: "What do we mean by being eligible to receive the 'financial benefits' of an early out?" *Id*. at 5. The answer was that the company would "provide any corresponding cash amount that is not connected to a company benefit plan and that the retiree would have been eligible for under the designated eligibility criteria for the early out plan being offered." *Id*. Any employee who retired prior to January 1, 2021 would still be eligible for the 2017 Policy. *Id*. at 1.

### Voluntary Separation Leave Program ("VSL")

On January 21, 2021, United announced the Voluntary Separation Leave program ("VSL"). SAC ¶ 59. Like VSP2, VSL was a company-wide early separation program; however, VSL provided substantially better benefits to those retiring under its terms. *Id*. ¶¶ 60-61, 63. VSL included two options for retirees. *Id*. ¶ 63. Option A offered payment of 33% of the employee's wages up to $20,000 through the end of 2021 (referred to as the "pre-separation period"), a $125,000 contribution to a Retiree Health Account, continued medical coverage through the end of 2021, and active travel privileges through the end of 2026. *Id*. Option B offered payment of 100% of the employee's base wages up to $112,500 through August 31, 2022 (the pre-separation period for Option B), and active travel privileges through the end of 2026. *Id*. ¶ 64. Employees who retired under VSL would be paid their wages (or, under Option A, 33% of those wages) on a regular payroll schedule, but did not need to report to work; at the end of the pre-separation period, they would be terminated from employment and would no longer be eligible for rehire or recall. *Id*. ¶ 66.

United did not notify employees who had already retired as of January 21, 2021 about VSL. *Id*. ¶ 67. In the FAQs issued with VSL, United stated again: "This program is not an early out, which is a financial incentive program that provides cash upon separation. This Program provides paid leave or medical and pass travel enhancements. Those types of benefits are excluded from the 2017 Program, which was updated in 2020." *Id*. ¶ 68.

**Plaintiffs' Retirements**

Named plaintiffs Hoffman, Roumain[1], Frank, Loucks, and Gawler all retired under VSP2 in June or July of 2020. *Id*. ¶¶ 70-75. Plaintiff Merlini retired in April 2020 under a predecessor

---

[1] Plaintiff Roumain passed away in August 2023. Pursuant to Federal Rule of Civil Procedure 25(a)(1), Judith Dupoux was substituted for Roumain as the representative of Roumain's estate. ECF Nos. 91-92.

program to VSP2 known as VSP1. *Id*. ¶ 74. Plaintiff Kearney retired from United in October 2017; plaintiffs Yustman, Ozaki, and Hewson retired in 2019; and plaintiffs Deglauve and Fellows retired in January and December 2020, respectively (though not under VSP1 or VSP2).[2] *Id*. ¶¶ 76-78, 82-84, 87. Excepting plaintiff Kearney, who retired more than three years before United offered VSL, all plaintiffs allege that despite United's contention, VSL is effectively an early out program and that they are all entitled to its financial benefits under the terms of the 2017 Policy. Excepting those plaintiffs who retired under VSP2, all plaintiffs allege that VSP2 is also an early out program and that they should be entitled to its benefits under the 2017 Policy.

## ANALYSIS

The plaintiffs seek payment of benefits under ERISA § 502(a)(1)(B), which allows a plan "participant or beneficiary" to recover plan benefits. 29 U.S.C. § 1132(a)(1)(B). The plaintiffs assert that (1) VSP2 and VSL are ERISA-governed plans in which they are participants by virtue of the 2017 Policy, and (2) the 2017 Policy itself is an ERISA-governed employee welfare benefit plan in which they are participants. The plaintiffs also allege that United's actions with respect to the 2017 Policy—namely, excluding them from the VSP2 and VSLP programs and failing even to notify them of those programs—amount to both a violation of United's fiduciary duties as set forth in ERISA § 404(a) and an interference with the plaintiffs' attainment of rights under ERISA § 510. Finally, the plaintiffs set forth a state law theory that the 2017 Policy constituted a contract between United and its employees, and that United breached that contract by refusing to allow the plaintiffs to participate in the VSP2 and VSL programs.

---

[2] Named plaintiff Ornellas voluntarily dismissed his claims against United and has been terminated as a plaintiff, except insofar as he remains a member of the putative class.

The defendants, for their part, argue primarily that the 2017 Policy is not an ERISA-governed plan, that the monetary-benefit portions of VSP2 and VSL are not ERISA governed, and that the plain terms of VSP2 and VSL precluded the plaintiffs' eligibility for the programs. They also assert that United was not acting as a fiduciary when it created and implemented the eligibility terms of VSP2 or VSL and that United could not have interfered with the plaintiffs' attainment of rights under the programs because the plaintiffs had no rights under the programs to begin with. Finally, the defendants argue that even if the 2017 Policy constituted a contract, it did not entitle plaintiffs to any benefits under VSP2 or VSL.

## I. ERISA

The plaintiffs' claims for relief under ERISA hinge on the threshold question of whether the 2017 Policy constitutes an ERISA plan. Even assuming VSP2 and VSL are wholly governed by ERISA (and the defendants posit that the "pre-separation" monetary benefits are not ERISA governed), the plaintiffs are not "participants" in those programs except to the extent that the 2017 Policy qualified them to participate.[3] VSL and VSP2 were made available only to current United employees. All of the plaintiffs had already retired from United by the time VSL was announced, making them ineligible for the program on its own terms, and all but one of the plaintiffs who did not retire under VSP2 retired prior to VSP2 issuing and would also have been precluded from participating in that program.[4] The plaintiffs concede as much, arguing that the 2017 Policy made

---

[3] Excepting, of course, those plaintiffs who expressly retired under VSP2 and received those benefits: Hoffman, Roumain, Frank, Loucks, and Gawler.

[4] The one exception to this is plaintiff Fellows, who retired in December 2020 (after VSP2 issued) but not under VSP2, VSL, or any other separation program. The SAC, however, alleges that Fellows was not working for several months prior to VSP2, and so it is not clear whether she would have been eligible for the program. In any event, she did not opt to retire under VSP2, and the SAC does not allege that she did not receive notice of VSP2; the Court therefore sees no reason Fellows is entitled to the benefits of VSP2.

them participants in VSP2 and VSL or, alternatively, that the 2017 Policy gave them a colorable claim to benefits such that they have standing to sue. Therefore, if the 2017 Policy does not amount to either an ERISA plan or an enforceable contract on which the plaintiffs can sue, the plaintiffs have no access to the benefits of VSP2 or VSL.

ERISA § 502(a)(1)(B) allows a "participant or beneficiary" to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). A "plan means an employee welfare benefit plan or an employee pension benefit plan or a plan which is both." *Id*. § 1002(3) (quotation marks omitted). An "employee welfare benefit plan," in turn, is "any plan, fund, or program . . . established or maintained by an employer . . . for the purpose of providing . . . medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment." *Id*. § 1002(1). Courts may determine that an ERISA plan has been established where the benefits at issue (1) require an ongoing administrative scheme, and (2) feature terms that are reasonably ascertainable. *See Cvelbar v. CBI Ill. Inc.*, 106 F.3d 1368, 1374 (7th Cir. 1997), *abrogated on other grounds by Int'l Union of Operating Eng'rs, Local 150 v. Rabine*, 161 F.3d 427(7th Cir. 1998).

The Supreme Court, in *Fort Halifax Packing Co. v. Coyne*, set forth the rule that ERISA governs only those employee benefits which "by nature require[] an ongoing administrative program to meet the employer's obligation." 482 U.S. 1, 11 (1987). The Court found that ERISA did not preempt a Maine statute which required any employer who closed a plant with more than 100 employees to provide those employees with one week of pay for each year of employment. *Id*. at 16. The Court explained:

> The requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation.

> The employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control. Rather, the employer's obligation is predicated on the occurrence of a single contingency that may never materialize. The employer may well *never* have to pay the severance benefits. To the extent that the obligation to do so arises, satisfaction of that duty involves only making a single set of payments to employees at the time the plant closes. To do little more than write a check hardly constitutes the operation of a benefit plan.

*Id*. at 12. Since *Fort Halifax*, courts have found similar one-time severance payments to be outside ERISA's purview. In *James v. Fleet/Norstar Financial Group, Inc.*, the Second Circuit held that a company's promise to its employees that they would receive 60 days of additional pay if they waited until a consolidation was complete to leave the company was not an "employee welfare benefit plan" under ERISA because the severance pay "would occur over a short time" and required only "simple arithmetical calculations and [a] clerical determination" of each employee's severance pay. 992 F.2d 463, 466-68 (2d Cir. 1993); *see also Young v. Wash. Gas Light Co.*, 206 F.3d 1200, 1203-04 (D.C. Cir. 2000) (program that offered employees who retired early 52 weeks of their base pay was not subject to ERISA because "determinations of eligibility and the amount of benefits to be paid were purely mechanical and were based on one triggering event"); *Velarde v. PACE Membership Warehouse, Inc.*, 105 F.3d 1313, 1315, 1317 (9th Cir. 1997) (program whereby employer gave severance pay to certain employees who "stayed on" for a certain length of time before a warehouse closure was not ERISA plan because "the employer was simply required to make a single arithmetical calculation to determine the amount of the severance benefits").

These cases contrast with those where an employer offered benefits which were to be paid over the course of time, were more complex than simple monetary payments, and/or required ongoing involvement by the employer after the employee's departure. *See, e.g., Bowles v. Quantum Chem. Co.*, 266 F.3d 622, 632 (7th Cir. 2001) (severance plan that required employer to

9

evaluate whether or not the employee's duties had diminished after a change in corporate control and budget for the possibility of multiple severance demands over the course of a year required more than "a single, mechanical, nondiscretionary application of the plan's terms" and was therefore an ERISA plan); *Cvelbar*, 106 F.3d at 1376-77 (where an employee's severance agreement required his employer to assess the nature of his termination to determine eligibility and then pay severance benefits, process medical claims, and monitor the employee's compliance with a non-compete clause for three years after termination, the severance agreement constituted an ERISA plan).

"[T]he sort of discretion that brings a severance plan within ERISA's coverage is a matter of degree, the assessment of which requires the court to draw fine lines." *Bowles*, 266 F.3d at 632. Here, the Court finds that the 2017 Policy lacks the ongoing administrative oversight and discretion which would signify an "employee welfare benefit plan" under ERISA. The 2017 Policy shares certain features of the benefits provided by the Maine statute in *Fort Halifax*, namely their contingency. Any "monetary incentives" to be paid under the 2017 Policy were contingent on United offering an early out program—"a contingency that may never materialize." *Fort Halifax*, 482 U.S. at 12. United in fact emphasized the uncertainty of such payments ever being made in the FAQs issued with the 2017 Policy, which described an early out as an "unlikely scenario." Ex. B to Lounsbury Decl. 2. And while the nature of the monetary benefits bestowed by any potential early out program may have varied, the application of the 2017 Policy to United employees was mechanical. Any employee who retired within the previous 36 months of any early out policy offered by United, in good standing, and with 10 to 20 years of service depending on their age, would receive the early out's financial benefits. United clarified the nature of "financial benefits" in its October 2020 update as referring to "any corresponding cash amount that is not connected

to a company benefit plan[.]" Ex. C to Lounsbury Decl. 5. This supports United's argument that any potential payment being made under the 2017 Policy would have been a one-time, lump-sum payment and would have imposed no obligation on United other than "writ[ing] a check." *Fort Halifax*, 482 U.S. at 12. Even accepting the plaintiffs' argument that VSP2 and VSL *were* early out programs that merely paid financial benefits over the course of a pre-separation period rather than in a single lump payment, that arrangement would not transform the 2017 Policy into an ERISA plan because it would still not impose "periodic demands on [United's] assets that create a need for financial coordination and control." *Id.*; *see also James*, 992 F.2d at 466 ("The employee's option to receive the [60 days of additional pay] in bi-weekly installments instead of in a lump sum did not change the basic situation.").

The plaintiffs argue that the 2017 Policy required an ongoing administrative scheme insofar as it required United to "administer any benefits that the company might later offer and to keep track of the eligible retirees." Pls.' Opp. to Mot. to Dismiss 8, ECF No. 60. But those tasks amount to no more than cutting checks to eligible employees—burdens which are certainly no greater than those imposed on the employers in *Fort Halifax*, *James*, *Young*, or *Velarde*. The plaintiffs also argue that the 2017 Policy meets the criteria for ERISA governance because its "intended benefits, beneficiaries, source of financing, and procedures for receiving benefits" are reasonably ascertainable. *Diak v. Dwyer, Costello & Knox, P.C.*, 33 F.3d 809, 812 (7th Cir. 1994) (quoting *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir. 1982) (en banc)). But having determined that the 2017 Policy does not implicate an ongoing administrative scheme for United, the Court need not assess whether the 2017 Policy's terms are reasonably ascertainable—a requirement for ERISA plans which, in any event, is "more acute when no writing exists to evidence the plan," and which, on its own, does not convert the promise of benefits into an ERISA-governed plan.

11

*Cvelbar*, 106 F.3d at 1378. Further, the 2017 Policy does not indicate with any specificity what benefits would be due to retirees under its terms. The 2017 Policy merely promises "financial benefits," to be spelled out in detail at a later date. Contrast that ambiguity with the benefits offered to the plaintiff in *Cvelbar*: a lump sum calculated pursuant to a precise formula explicitly set forth in the plaintiff's employment agreement, and a monthly payment to be calculated based on the plaintiff's deferred pension amount. *Id*. at 1371. Based on the 2017 Policy alone, there is no way for the plaintiffs to know the amount to which they might be entitled. For that reason, the Court agrees with United that the 2017 Policy amounts not to a plan but to a "promise to create a benefit plan[.]" *Nw. Airlines, Inc. v. Fed. Ins. Co.*, No. 3-91-0228, 1993 WL 729630, at *7 (D. Minn. Jan. 13, 1993) ("A promise to create an [Employee Stock Ownership Plan] does not constitute a procedure for receiving benefits. The salaried ESOP itself, once created, likely contained sufficiently detailed procedures for receiving benefits and description of intended beneficiaries to qualify as an ERISA benefits plan."); *see also Gaik v. Travelers Ins. Co.*, 945 F. Supp. 1122, 1128 (N.D. Ill. 1996) ("A plan need not be in writing, but it must exist in reality and must be more than a mere decision to extend benefits. Plaintiff must also establish more than just an intention by an employer to adopt a plan; the plan must in fact be in place." (citations omitted)).

Because the 2017 Policy does not constitute an ERISA-governed employee welfare benefit plan, the plaintiffs cannot sue for the monetary benefits of VSP2 or VSL pursuant to ERISA § 502(a)(1)(B). Nor can they seek equitable relief for United's alleged violations of ERISA § 404(a), which requires the fiduciary of a ***plan*** (which the 2017 Policy is not) to discharge his duties solely in the interest of the plan's ***participants and beneficiaries*** (which the plaintiffs are not).[5] 29 U.S.C.

---

[5] While those plaintiffs who retired under VSP2 are participants in that plan, United's failure to inform those plaintiffs of VSL or provide them the opportunity to apply for its benefits does not amount to a breach of fiduciary duty. Section 404(a) speaks to a fiduciary's duties "with

§ 1104(a)(1)(A)(i). The plaintiffs' theory that United's actions amounted to interference with protected rights under ERISA § 510 fails for similar reasons. That section makes it "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan[.]" *Id*. § 1140. Again, the plaintiffs do not qualify as "participants" in any "plan" under the meaning of the statute, so United cannot have interfered with their rights under the statute. As to the VSP2 participants, they have not alleged that United interfered with a right owed to them ***under VSP2***, as that plan did not entitle them to the benefits of VSL.

The plaintiffs have failed to state a claim that is entitled to relief under ERISA.

## II. Breach of Contract

The plaintiffs allege, in the alternative, that "[t]he 2017 promise made by Oscar Munoz and the written 2017 [Policy] instituted by United constitutes a contract between United and its employees" and that "[o]nce [the plaintiffs] retired, the contract became fully enforceable as a unilateral contract."[6] SAC ¶¶ 161-62. The defendants primarily respond to this theory by arguing

---

respect to a plan." 29 U.S.C. § 1104(a)(1). "There is nothing in the section to suggest that an ERISA plan administrator has a fiduciary duty to disclose information unrelated to the plan even if an employee might consider that information important to his decision to retire." *Young v. Washington Gas Light Co.*, 206 F.3d 1200, 1204 (D.C. Cir. 2000); *see also id.* at 1205 (defendant employer "had no fiduciary duty under its ERISA retirement plan to inform [the plaintiff] that a retirement incentive program was under consideration").

[6] The plaintiffs assert that the Court has subject matter jurisdiction over the claim based on a state law breach of contract theory under supplemental jurisdiction, 28 U.S.C. § 1367. Ordinarily, the Court would decline to exercise supplemental subject matter jurisdiction given the failure of the only federal law theory asserted by the plaintiffs. In this case, however, the plaintiffs have also adequately alleged subject matter jurisdiction under CAFA, 28 U.S.C. § 1332(d), so the Court has no basis to decline to exercise subject matter jurisdiction pursuant to 28 U.S.C. § 1367.

that "assuming there was a contract at all," no breach occurred because VSP2 ad VSLP were not "early out" programs in that they did not provide "cash upon separation," but rather a "salary continuation." Defs.' Memo. in Support of Mot. to Dismiss 13-15, ECF No. 58.

The Court agrees with the defendants that the plaintiffs have not stated a claim for a breach. First, the 2017 Policy makes clear that it is directed at members of certain "workgroup[s] offering the Early Out." Ex. A to Lounsbury Decl. 2. The FAQs state: "[I]f we introduce an early out program for any of our workgroups, any member of an eligible workgroup . . . will receive the financial benefits of that early out." Ex. B to Lounsbury Decl. 2. And the SAC alleges that previous early out programs were directed at specific workgroups—that is, specific divisions of United such as mechanics or flight attendants. SAC ¶¶ 33-34. VSL and VSP2, in contrast, were offered not by a workgroup for its specific employees, but to employees across the entire company. This distinction suggests they were not, in fact, early out programs as envisioned by the 2017 Policy.

Second, the SAC alleges that previous early outs offered lump sum payments to employees retiring under the programs. *Id*. That is a different type of "financial benefit" from those offered by VSP2 and VSL, which, as defendants argue, offered employees a continuation of some percentage of their wages during a period of leave prior to separation. The October 2020 update to the 2017 Policy, emphasizing that "financial benefits" mean a "corresponding cash amount" offered by an early out, further supports the defendants' position that VSP and VSL were not early out programs and that the financial benefits of those programs were not those contemplated by the 2017 Policy.

Relatedly, although the plaintiffs maintain that the differences between an early out program and a pre-separation program like VSP2 or VSL were semantic, in fact they were materially different. Early out programs, which paid cash upon separation, did not alter an

employee's relationship with the company—they ended it. As evidenced by VSP2 and VSL, however, pre-separation program participants maintained their status as employees of the company for the duration of the program. As United points out, although participants in such programs were not required to report to work, they remained (unlike early out participants) subject to United's terms of employment, could be terminated for cause (depriving them of the full financial benefit of the program), and were precluded from taking pension and 401(k) distributions—something those who were no longer employees were entitled to do.

Finally, setting aside whether or not the 2017 Policy encompassed programs like VSP2 and VSL, United expressly reserved the right to modify or terminate the 2017 Policy at any time. Under the Policy's express language, United had the discretion to announce VSP2 and VSL, declare them bona fide early out programs, and simply decline to pay the financial benefits without technically breaching the 2017 Policy's plain terms. What's more, this feature of the 2017 Policy does not only pose a problem for the plaintiffs' ability to point to a breach; it casts considerable doubt on whether the 2017 Policy constitutes a contract.

To state a claim for breach of contract under Illinois law, the plaintiffs must first establish the existence of a valid and enforceable contract.[7] *See Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010). Where an employer has "the right and discretion to cancel the entire program at any time," an employee cannot "reasonably believe" that an offer has been extended. *Grottkau v. Sky Climber, Inc.*, No. 93-cv-06277, 1995 WL 32611, at *21 (N.D. Ill. Jan. 26, 1995)

---

[7] The defendants do not argue that the 2017 Policy did not constitute a unilateral contract, and the Court is willing to accept that the plaintiffs' choice not to delay their retirement—which was clearly United's goal in offering the policy—conferred enough of an "indirect benefit" on United to satisfy the "requirement of consideration." *Patel v. Am. Bd. of Psychiatry & Neurology, Inc.*, 975 F.2d 1312, 1314 (7th Cir. 1992) (for a unilateral contract to be created, "the offeree is obligated at the least to do something that the offeror wants him to do even if the requested performance will not confer a palpable, obvious benefit on the offeror.").

(where sales incentive plan included language giving the employer the "right to modify or cancel the incentive program at any time," the plan did not "create an enforceable contract right"); *see also Maxwell v. Vertical Networks, Inc.*, No. 03-cv-05715, 2005 WL 950634, at \*6 (N.D. Ill. Mar. 18, 2005) ("[W]here an employer retains the right to make unilateral modifications to the plan at any time, there can be no reasonable belief that an offer was made with regard to the incentive compensation."). Given United's broad discretion to walk back the 2017 Policy at any time, there is reason to question whether the plaintiffs have enforceable contract rights under the policy. United, however, has assumed the existence of a valid contract and so has waived any challenge to the validity of the 2017 Policy as a contract. The defendants' brief caveat—"assuming there was a contract at all"—does not properly raise the issue for the Court's review. *See Shipley v. Chicago Bd. of Election Comm'rs*, 947 F.3d 1056, 1063 (7th Cir. 2020) ("Arguments that are underdeveloped, cursory, and lack supporting authority are waived.").

Regardless, given the distinctions between VSP2 and VSL and United's previous early out programs, as reflected in the SAC, the plaintiffs have failed to state a claim for relief based on breach of contract.

\*     \*     \*

Because the plaintiffs have failed to state a plausible claim for relief under any identified legal theory, the defendants' motion to dismiss for failure to state a claim under Rule 12(b)(6) is granted. Although it seems unlikely that the plaintiffs can cure the problems with the complaint, given that they are legal in nature, the dismissal will be without prejudice, in keeping with the Seventh Circuit's instructions that ordinarily, plaintiffs should be given at least one opportunity to replead, and the plaintiffs' request to replead should the defendants' motion prevail. The plaintiffs

are granted until May 22, 2025 to file an amended complaint consistent with the Court's ruling on the instant motion.

Date: May 1, 2025

John J. Tharp, Jr.
United States District Judge